Newman, Circuit Judge,
concurring in part, dissenting in part.
The court today holds that the United States is not contractually bound by a nondisclosure agreement signed for the “United States" Government, Department of Defense,” by Lieutenant Colonel (then Major) Glenn Dean,[1] in his position as Chief of the Small Arms Branch of the Directorate of Combat Development, United States Infantry. The purpose of the agreement was to receive disclosure of proprietary information concerning the new ammunition invented by Mr. P.J. Marx.
Lt. Col. Dean testified in the Court of Federal Claims that he was the United States official responsible for this subject matter, and that he had signed “about five” nondisclosure agreements in that role as Chief for small arms development. My colleagues hold that the United States is not bound by this agreement, finding that Lt. Col. Dean had no authority, either express or implied, to sign such agreements. There is no evidentiary support for this holding; indeed, even now the United States does not appear to have criticized or reprimanded Lt. Col. Dean, despite the government’s insistence that he acted improperly and that his contractual promise is meaningless.
Law and precedent establish that Lt. Col. Dean’s implicit authority sufficed to provide a valid nondisclosure agreement. The government’s position is not only contrary to law and precedent—it is also untenable as a matter of the integrity of government practice.
On the merits of the issue of infringement of the Liberty Ammunition U.S. Patent No. 7,748,325 (the ’325 patent), I agree with the court that the claims are not literally infringed by the Army’s design of rounds in which the base of the projectile is completely “jacketed” by the interface.
The NONDISCLOSURE Agreement
Several nondisclosure agreements were signed by various government representatives in order to receive Mr. Marx’s technology. This case focuses primarily on the agreement signed by Lt. Col. Dean for the Department of Defense.[2] The government argues, successfully, that Lt. Col. Dean had no authority to enter into a nondisclosure agreement, and therefore that the agreement was void. The government’s position appears to be that it is entitled to disclose outside the government and use Mr. Marx’s proprietary information without obligation or license.
In brief background: Mr. Marx developed experimental ammunition in response to the Army’s announced request for industrial assistance to develop improved *1404 ammunition and to comply with the “Green Ammunition Program” to remove lead on environmental grounds. Witnesses testified that early attempts to resolve these concerns by substituting tungsten for lead were expensive and ineffective. The record shows multiple failures until receipt and review of the Marx technology provided the successful direction.
Mr. Marx, in undisputed testimony, explained that he was directed to Lt. Col. Dean at the Directorate of Combat Development (DCD) by the Project Management Engineer for the Green Ammunition Program. Trial Tr. at 351, ll. 1-3, Liberty Ammunition v. United States, 119 Fed.Cl. 368 (2014) (Dkt. 76). Mr. Marx testified that the Project Management Engineer stated that while he lacked the authority to sign an NDA, Lt. Col. Dean was authorized to execute such agreements. Id.
Prior to meeting with Lt. Col. Dean, Mr. Marx requested information on the government’s “procedure for receiving proprietary information,” and asked if the government had a “standard agreement of nondisclosure.” Trial Tr. at Ex. 5 (Dkt. 74) (Email exchange between Maj. Glenn Dean and P.J. Marx (November 18, 2004)). Lt. 'Col. Dean assured Mr. Marx that “[w]e’ll protect and secure anything you mark as proprietary information” and that if Mr. Marx had a nondisclosure agreement, “we can have anyone who would be in contact with specifics sign.” Id.
After Lt. Col. Dean executed the “Bilateral Non-Disclosure Agreement” on behalf of the “United States Government, Department of Defense,” id. at Ex. 3, Mr. Marx provided the technical description, test information, and fifty sample rounds of his new ammunition. After receiving this information, Lt. Col. Dean reported to other Army research divisions that the Marx projectile is a “very promising technology that lines up well with our lethality improvement effort.” Id. at Ex. 8 (Email from Maj. Glenn Dean (Feb. 17, 2005)).
Lt. Col. Dean testified in the Court of Federal Claims that the Directorate of Combat Development is the “lead combat developer for all infantry and soldier systems,” Trial Tr. at 46,11. 5-6 (Dkt. 74). He testified that his assignment as Chief of the Small Arms Branch is to identify and develop new and improved technologies, and to work in collaboration with private industry. Id. at 48. However, the government now argues, and my colleagues agree, that Lt. Col. Dean had neither express actual authority nor implicit actual authority to sign the nondisclosure agreement.
Precedent distinguishes among actual authority, implied actual authority, and apparent authority of government representatives. The panel majority recognizes that authority of government officials “is generally implied when such authority is considered to be an integral part of the duties assigned to a government employee,” H. Landau & Co. v. United States, 886 F.2d 322, 324 (1989), “when the government employee could not perform his or her assigned tasks without such authority,” Flexfab, LLC v. United States, 62 Fed.Cl. 139, 148 (2004), aff'd 424 F.3d 1254 (Fed. Cir. 2005). In H.F. Allen Orchards v. United States, 749 F.2d 1571, 1575 (Fed. Cir. 1984), the court explained that “[a]l-though apparent authority will not suffice to hold the government bound by the acts of its agents, implied actual authority, like expressed actual authority, will suffice.” See also Fifth Third Bd. of W. Ohio v. United States, 402 F.3d 1221, 1235 (Fed. Cir. 2005) (government representative had implied actual authority, and bound the government); Phila. Suburban Corp. v. United States, 217 Ct.Cl. 705, 707 (1978) (government is bound when the signing *1405 government official has implied authority or ratification).
The record contains extensive evidence that the receipt and protection of proprietary information from the private sector was integral to Lt. Col. Dean’s position as Chief of the Small Arms Branch. He testified that he met “literally on a weekly basis” with industry representatives with a product or idea related to small arms. Trial Tr. at 129, l. 21-130, l. 3 (Dkt. 74) (“I mean literally on a weekly basis would have some company, contractor, person who had a good idea, a product they wanted to sell, who would come into my office ... and give us their pitch on here’s our great idea and here’s why the U.S. Army should buy it and here’s why you specifically should give us a requirement to allow the PM to buy our product.”).
Lt. Col. Dean estimated that these industry meetings alone consumed eight hours each week. Id. at 130, ll. 8-9. He testified that he served as the “user representative” in evaluating technology needs, the possibilities of new technologies, and deciding whether they would benefit soldiers in the field. Id. at 48. He testified that he had signed nondisclosure agreements in the past. Id. at 66, l. 3. When asked if he had ever refused to sign a nondisclosure agreement, Lt. Col. Dean responded “Not to my knowledge.” Id. at 66, l. 5. Lt. Col. Dean also testified that it was “common” to receive proprietary information. Id. at 130, ll. 21-23. Other Directorate witnesses testified to the “policy” of the Small Arms Branch “to protect the privacy of the information provided” by industry representatives. Trial Tr. at 500, ll. 13-15 (Dkt. 76). No witness identified any other individual or entity with the authority to enter into nondisclosure agreements related to the Small Arms Branch responsibilities. See, e.g., Trial Tr. at 131, l. 25-132, l. 1 (Dkt. 74) (Testimony of Lt. Col. Dean) (“[T]he business development activity was—I never saw a contracting officer involved with that.”). Despite this extensive record, and no contrary evidence, the government’s position is that this agreement, by the officer of the United States charged with the responsibility of advancing small arms development, is worthless—and my colleagues on this panel agree.
The majority holds that because Lt. Col. Dean signed less than five nondisclosure-agreements over his two years at the Directorate, he lacked authority to bind the government to a nondisclosure agreement with Liberty. Maj. Op. at 1402. Does this mean that if an industry representative offers information under a nondisclosure agreement, and the government official agrees and signs the agreement, the industry representative must inquire how many nondisclosure agreements that official had previously signed, and then guess how many would be needed to support the official’s asserted authority?
The Court of Federal Claims relied additionally on' Lt. Col. Dean’s lack of formal “contracting officer” status. A contracting officer “obligate[s] - the Government to an expenditure of appropriated funds.” 48 C.F.R. §§ 1.602, 2.101. Nondisclosure agreements need not incur expenditure; the issue here is disclosure of information, not expenditure. Lt. Col. Dean testified that contracting officers were “never” involved in proprietary business development meetings with industry. Trial Tr. at 131, l. 25-132, L 1 (Dkt. 74). Also, precedent establishes that lack of a contracting officer’s signature on a contract with the government does not foreclose a breach of contract claim if implied authority was present. Phila. Suburban Corp., 217 Ct.Cl. at 707.
Thus I must, respectfully, dissent from the court’s ruling that the government is *1406 not bound by the nondisclosure agreement signed by its representative.
Liability
The Court of Federal Claims held the ’325 patent valid, and infringed by'the A1 modifications of the M855 and M80 projectiles. My colleagues hold that the patent is not infringed. I agree that the patent is not infringed by these A1 projectiles, for it was undisputed that the entire base of the A1 projectile is enclosed or “jacketed,” unlike the claimed ’325 projectile. The ’325 claims require that the metal interface does not enclose the base of the projectile. Thus I join the court’s ruling of non-infringement.
There was evidence that the Marx invention showed the way to the design of the M855A1. Dr. Newill, who was the “Technical Lead” of the Green Ammunition Program, a few months after receiving the Maine technology advised the Army that the problems of both lethality and the environment had been solved, referring to the A1 modification. At trial, Dr. Newill could not point to any laboratory documentation of independent origin of the concepts embodied in the Marx projectile. Trial Tr. at 1466, ll. 18-20 (Dkt. 84). Liberty points out that there were no entries in any government Laboratory Notebooks (required by Army Regulation 27-60), and no drawings or sketches or other evidence of conception. Id. at 1463-66. Mr. Campion, who reviewed the Marx information for the Special Services Command, confirmed that Marx led to this breakthrough, testifying that “[tjhey’ve been developing the green round for 17 years now.” Trial Tr. at 999, ll. 7-8 (Dkt. 80). The government did not contradict these witnesses.
These aspects warrant resolution in connection with the disclosure conditions and to determine the consequences of any breach of the nondisclosure contract. I would remand for this purpose. I respectfully dissent from my colleagues’ disposition of this aspect.

. To conform with the government’s usage, we use the rank of Lt. Col., without the precision of earlier or later rank at any given time.

. The U.S. Special Forces Command representative also entered into a nondisclosure agreement with Mr. Marx. This Command awarded Marx a development contract for other projectiles. Such projectiles are not here at issue.