# United States Court of Appeals for the Federal Circuit

2007-5070, -5071

C. ROBERT SUESS, LEO SHERRY, RICHARD A. GREEN, IRVING ROBERTS, on behalf of all other shareholders of Benjamin Franklin Federal Savings and Loan Association, PETER BAKER, BENJAMIN FRANKLIN FEDERAL SAVINGS AND LOAN ASSOCIATION, and DONALD MCINTYRE,

Plaintiffs-Cross Appellants,

and

FEDERAL DEPOSIT INSURANCE CORPORATION,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Eric W. Bloom, Winston & Strawn LLP, of Washington, DC, argued for plaintiffs-cross appellants. With him on the brief was Thomas M. Buchanan. Of counsel was Charles B. Klein. Of counsel on the brief were Don S. Willner, Don S. Willner & Associates, PC, of Trout Lake, Washington; and Rosemary Stewart, Spriggs & Hollingsworth, of Washington, DC.

D. Ashley Doherty, Counsel, Legal Division, Federal Deposit Insurance Corporation, of Washington, DC, argued for plaintiff-appellee. With her on the brief was John V. Thomas, Deputy General Counsel.

Kenneth M. Dintzer, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Michael F. Hertz, Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and F. Jefferson Hughes and Sameer Yerawadekar, Trial Attorneys.

Appealed from: United States Court of Federal Claims

Senior Judge Loren A. Smith

# United States Court of Appeals for the Federal Circuit

2007-5070, -5071

C. ROBERT SUESS, LEO SHERRY, RICHARD A. GREEN, IRVING ROBERTS, on
behalf of all other shareholders of Benjamin Franklin Federal Savings and Loan
Association, PETER BAKER, BENJAMIN FRANKLIN FEDERAL SAVINGS AND LOAN
ASSOCIATION, and DONALD MCINTYRE,

Plaintiffs-Cross Appellants,

and

FEDERAL DEPOSIT INSURANCE CORPORATION,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeals from the United States Court of Federal Claims in 90-CV-981, Senior
Judge Loren A. Smith.

---

DECIDED: August 7, 2008

---

Before MAYER, SCHALL, and MOORE, <u>Circuit Judges</u>.

SCHALL, <u>Circuit Judge</u>.

This is a shareholder derivative suit growing out of our decision in <u>Winstar Corp.
v. United States</u>, 64 F.3d 1531 (Fed. Cir. 1995) (en banc) ("<u>Winstar I</u>"), <u>aff'd</u>, 518 U.S.
839 (1996). The United States appeals from the final judgment of the United States

Court of Federal Claims awarding C. Robert Suess and other former shareholders (collectively "Suess")[1] of Benjamin Franklin Federal Savings and Loan Association ("Franklin") $52,008,750 in damages for two separate breaches of contract. Suess v. United States, 74 Fed. Cl. 510 (2006) ("Damages Decision II").

The court arrived at its final determination on liability and the amount of damages over the course of three separate decisions. In California Federal Bank v. United States, 39 Fed. Cl. 753 (1997) ("Contract Decision"), a consolidated case, the Court of Federal Claims, on summary judgment, held that a contract arose between Franklin and the government in connection with Franklin's acquisition of Equitable Savings and Loan Association ("Equitable"). The court also held that, pursuant to that contract, the government had agreed that Franklin could treat the goodwill arising from Franklin's acquisition of Equitable as regulatory capital, an accounting treatment permitted by the so-called "purchase method" of accounting, and could amortize the goodwill over a period of forty-years. Id. at 776. The court further held that a similar contract had arisen between Franklin and the government in connection with Franklin's acquisition of Western Heritage Savings and Loan Association ("Western"). Id. at 779. Later, by an unpublished order issued on November 12, 1998, the court entered summary judgment in favor of Suess, holding that the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (1989), breached both of these contracts by phasing out the use of goodwill to satisfy regulatory capital

---

[1]    C. Robert Suess, Leo Sherry, Richard A. Green, Irving Roberts, Peter Barker, and Donald McIntyre are all shareholders of Benjamin Franklin Federal Savings and Loan Association. They brought this action on behalf of that company and of all other shareholders.

requirements.  See Suess v. United States, 52 Fed. Cl. 221, 224 (2002) ("Damages Decision I").

In Damages Decision I, following a trial, the Court of Federal Claims awarded Suess damages in the amount of the market value of Franklin stock on the day prior to the government's breach, estimated at approximately $35 million.  Id. at 232.  Finally, in Damages Decision II, in which it granted in-part Suess's second motion for reconsideration, the court determined that Suess also was entitled to recover a fifty percent control premium over the market value of Franklin's stock.  The court therefore increased the damages award to $52,008,750.  Damages Decision II, 74 Fed. Cl. at 518.  The court, however, declined to award Suess compensation for certain taxes paid on behalf of Franklin by the Federal Deposit Insurance Corporation ("FDIC") while Franklin was in receivership.  Id. at 515.

On appeal, the government contends that the Court of Federal Claims erred as a matter of law in holding that a contract existed between Franklin and the government for the treatment of goodwill arising out of the Franklin-Equitable transaction.  For this reason, the government urges, it could not be liable for breach of contract.  In the alternative, the government argues that, assuming such a contract did exist, the court erred as a matter of law in its determination of the damages arising from the breach of the contract.  On appeal, the government does not challenge the holding of the Court of Federal Claims that a contract existed between Franklin and the government for the treatment of goodwill arising out of the Franklin-Western transaction and that FIRREA breached that contract.

For its part, Suess cross-appeals the Court of Federal Claims' adverse ruling with respect to taxes paid on behalf of Franklin by the FDIC while Franklin was in receivership.

For the reasons discussed in this opinion, we agree with the government that no contract existed between Franklin and the government for the treatment of goodwill arising out of Franklin's acquisition of Equitable. Accordingly, the decision of the Court of Federal Claims in the Contract Decision holding the government liable for breach of contract in connection with that transaction is reversed, and the judgment of the court awarding damages to Suess in the amount of $52,008,750, as established in Damages Decision I and Damages Decision II, is vacated. The case is remanded to the Court of Federal Claims for the limited purpose of determining the amount of damages, if any, to which Suess is entitled solely as a result of the government's breach of the contract between Franklin and the government arising out of Franklin's acquisition of Western.

BACKGROUND

I.

The history and circumstances surrounding the thrift crisis of the early 1980s and the resulting enactment of FIRREA have been extensively discussed in opinions of the Supreme Court, see United States v. Winstar Corp., 518 U.S. 839, 843–58 (1996) ("Winstar II"), and of this court, see, e.g., Anderson v. United States, 344 F.3d 1343, 1345–47 (Fed. Cir. 2003); Cal. Fed. Bank, F.S.B. v. United States, 245 F.3d 1342 (Fed. Cir. 2001); Glendale Fed. Bank, F.S.B. v. United States, 239 F.3d 1374 (Fed. Cir. 2001). The following background is drawn largely from our decision in Anderson.

In the late 1970s and early 1980s, soaring interest rates and inflation had a devastating effect on the savings and loan industry. To compete for and attract funds in that financial climate, thrifts had to pay high interest rates for short-term deposits. Winstar II, 518 U.S. at 845. However, the cost of these liabilities soon exceeded the thrifts' income from their principal assets, which were long-term fixed-rate home mortgages created when interest rates were low. Id. More than 400 thrifts declared bankruptcy between 1981 and 1983, and many more were on the verge of insolvency. Id. The multitude of failed thrifts was threatening to exhaust the insurance fund of the Federal Savings and Loan Insurance Corporation ("FSLIC"), which insured consumer deposits in thrifts. Id. at 846–47.

In response to that crisis, the Federal Home Loan Bank Board (the "FHLBB"), the federal regulatory agency responsible for overseeing federally chartered savings and loans, encouraged healthy thrifts and outside investors to purchase insolvent thrifts in a series of "supervisory mergers." Id. at 847. To induce those mergers and to allow those acquisitions to proceed without the acquiring thrifts immediately becoming insolvent upon completion of the transactions, the FHLBB offered certain financial incentives. Id. at 848–50. The most important incentive was the accounting treatment of "supervisory goodwill," a term for the difference between the market value of an acquired entity's liabilities and assets. Id. at 849–50. This use of supervisory goodwill was attractive to healthy thrifts and outside investors for two main reasons. First, the FHLBB often permitted an acquiring thrift to count supervisory goodwill toward its reserve capital requirements. Id. at 850. Second, the regulators would in some instances permit the goodwill to be amortized over a long period of time while the thrift

could recognize accretion income over a shorter period through purchase accounting,[2] thus allowing the thrift to appear more profitable than it was in fact. Id. at 850–53. Given the advantages of these incentives and the inherent risks of substantially deviating from Generally Accepted Accounting Principles ("GAAP"), these arrangements were the subject of express agreements between the regulators and the acquiring institutions. Id. at 853–56. Despite such arrangements, the savings and loan industry remained in crisis.

In response, Congress enacted FIRREA in 1989 to prevent the collapse of the industry, to attack the causes of the crisis, and to restore public confidence. Id. at 856. FIRREA abolished the FHLBB and FSLIC, transferred thrift insurance activities to the FDIC, established the Office of Thrift Supervision ("OTS") as the new thrift regulatory agency, created the Resolution Trust Corporation ("RTC") to liquidate or otherwise dispose of certain closed thrifts and their assets, and made substantial changes in the regulation of the savings and loan industry. Id. In particular, the statute required thrifts to maintain a set minimum capital requirement and prohibited the use of supervisory goodwill. Id. at 857. Based on that statutory mandate, the OTS promptly promulgated

---

[2]     "Accretion income" is income arising from "growth in assets through mergers, acquisitions, and internal expansion." Joel G. Siegel & Jae K. Shim, Dictionary of Accounting Terms 12 (3d ed. 2000). The term "purchase accounting method" is an umbrella term for a number of different accounting devices, defined generally as "[a] method of accounting for mergers whereby the total value paid or exchanged for the acquired firm's assets is recorded on the acquiring firm's books, and any difference between the fair market value of the assets acquired and the purchase price is recorded as goodwill." Black's Law Dictionary 21 (8th ed. 2004). In the present case, the aspect of purchase accounting at issue between the parties is the ability to treat supervisory goodwill as regulatory capital. Contract Decision, 39 Fed. Cl. at 776; see also Fifth Third Bank of W. Ohio v. United States, 402 F.3d 1221, 1224 (Fed. Cir. 2005) (similarly involving the use of purchase accounting to count supervisory goodwill toward reserve capital requirements and to amortize such goodwill over an extended period of time).

regulations enforcing FIRREA and denying the continued use of supervisory goodwill in the thrifts' accounting procedures. Id. The impact of the new statute and regulations was swift and severe. In the wake of FIRREA, many thrifts rapidly fell out of compliance with regulatory capital requirements and were seized by regulators. Id. at 857–58.

These events spawned hundreds of lawsuits in which the acquirers of ailing thrifts sued the United States, alleging, inter alia, that by enacting FIRREA the government breached contracts with the thrifts promising particular regulatory treatment. Id. at 858–59. Eventually, in Winstar II, the Supreme Court upheld this court's en banc determination that documents executed by government regulators and the acquiring thrifts in connection with the supervisory mergers at issue constituted enforceable agreements. Id. at 859–60. Since then, we have reviewed a number of other appeals involving the same breach of contract cause of action. See, e.g., D & N Bank v. United States, 331 F.3d 1374 (Fed. Cir. 2003); Castle v. United States, 301 F.3d 1328 (Fed. Cir. 2002); Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348 (Fed. Cir. 2001). This is another such case.

## II.

## A.

In 1982, Franklin was a federally chartered mutual savings and loan association operating in the State of Oregon, with assets of approximately $1.6 billion. Damages Decision I, 52 Fed. Cl. at 224. Equitable also was operating in the State of Oregon. Like many thrift institutions in the early 1980s, Equitable was in imminent danger of failure. On March 31, 1982, the Federal Home Loan Bank of Seattle ("FHLB-Seattle") stated that "[c]onsideration is being given to [an] unassisted merger [of Equitable] with

an in-state association." Report on Category I Cases (Mar. 31, 1982).[3] Franklin, considering the acquisition of Equitable to present a potentially profitable business opportunity, "independently negotiated an in-state, unassisted merger" with Equitable by late May of 1982. Digest: Application for Merger 1–2.[4]

In order to complete its proposed merger with Equitable, Franklin was required to obtain the approval of the FHLBB. By May 11, 1982, Franklin representatives had presented a business plan for a potential merger between Franklin and Equitable to FHLB-Seattle representatives, requesting, inter alia, the use of purchase accounting in order to treat goodwill as regulatory capital. In a letter to Franklin's independent accounting firm, Peat, Marwick, Mitchell & Co., Robert Downie, the President of Franklin, described the May 11, 1982 business plan as follows:

> At a meeting on May 11 in Seattle, . . . Franklin presented a business plan for the acquisition of Equitable that was based on the combination of four factors to provide break-even in fiscal 1983 and profitability in 1984:
>
> 1. Purchase accounting;
>
> 2. Significant reduction in operating expenses;
>
> 3. Earnings from approved asset utilization and deposit growth; and
>
> 4. Earnings from the investment of $500 million in long-term fixed rate advances in deep discount loans and mortgage-backed securities.

Letter from Robert Downie, President of Franklin, to Donald Greco, Peat, Marwick, Mitchell & Co. (Sept. 24, 1982) (emphasis added).

---

[3] The Report on Category I Cases is an internal FHLB-Seattle document dated March 31, 1982. It presents a summary of Equitable's financial condition.

[4] The Digest: Application for Merger also is an internal FHLB-Seattle document. Dated September 8, 1982, it recites the conditional approval of the merger by FHLB-Seattle under authority delegated from the FHLBB and describes the interactions of Franklin and Equitable in negotiating the merger.

The following day, Mr. Downie presented a proposal for the acquisition of Equitable by Franklin to FHLB-Seattle President James Faulstich, which proposal also requested the use of purchase accounting. In a letter to Mr. Faulstich describing the proposal for acquisition, Mr. Downie stated:

> The acquisition will provide the firm with a break-even in fiscal 1983 and profitability in 1984—assuming continuation of present interest rate levels—through a combination of four factors: (1) purchase accounting; (2) significant expense reduction via a consolidation of overlapping branches in Oregon and duplicate staff functions; (3) earnings from improved asset utilization and deposit growth; and (4) earnings from the investment of $500 million in long-term advances.

Letter from Robert Downie, President of Franklin, to James Faulstich, President of FHLB-Seattle (May 12, 1982) (emphasis added).

On June 28, 1982, Franklin formally submitted to FHLB-Seattle its application for an unassisted merger with Equitable, proposing amortization of the goodwill acquired from the merger over a thirty-five year period. The application provided: "Goodwill: . . . . The excess of liabilities over assets is attributed to goodwill. This amount has been amortized over a period of 35 years." Franklin Application for Merger. On July 21, 1982, Franklin submitted a revised merger plan prepared by Kaplan Smith & Associates that provided for a forty-year amortization of goodwill.

Following Franklin's presentation of its business plan and application for merger, the FHLBB entered into discussions with Franklin regarding approval of the Equitable merger. On August 16, 1982, Franklin and Equitable representatives met with FHLBB accountants in Washington, D.C. During this meeting, Franklin and the FHLBB discussed the use of purchase accounting and the amortization of goodwill over a forty-year period. The FHLBB announced satisfaction with the terms of the proposed

merger, and Mr. Faulstich formally announced the FHLBB's conditional approval of the merger plan on September 8, 1982.   Approval of the merger was made conditional upon Franklin's providing notice to shareholders regarding the effects of the merger, certifying approval of the merger by stockholders and the board of directors, and providing the FHLBB with financial analyses of the merger.   Acting under its authority conferred by Federal Regulation section 546.2(h)(7), 47 Fed. Reg. 17802 (Apr. 26, 1982), FHLB-Seattle granted three forbearances to Franklin: (1) For purposes of calculating its net worth, Franklin was permitted to exclude for up to five years operating losses on acquired assets, capital losses sustained following disposition of acquired assets and acquired scheduled items, and the amount of liabilities of the acquired association.   (2) For purposes of calculating its liquidity, Franklin was permitted to exclude for up to one year any liquidity deficiency of the acquired association and any aggregate net withdrawals from the acquired association.   (3) For purposes of calculating the acquired association's investments, Franklin was permitted to exclude the building investments of the acquired association.

Submitting a "merger digest," FHLB-Seattle informed the Regional Director of the FHLBB that it had conditionally approved the Franklin-Equitable merger.   The merger digest recited FHLB-Seattle's approval of the merger and listed the key terms of the approval.   In addition to noting the forbearances that FHLB-Seattle was offering Franklin and discussing the financial viability of the merger, the merger digest stated that the merger would be accounted for under the purchase method.   Digest: Application for Merger 3 ("The transaction is to be accounted for by the purchase method.   An opinion issued by [an] independent accounting firm . . . indicates the

purchase method is appropriate for this transaction and that the application of that method . . . is in conformance with GAAP.").

On August 18, 1982, Franklin's Board of Directors approved the merger with Equitable. On April 22, 1983, in compliance with the conditions placed upon FHLB-Seattle's approval of the merger, Franklin's Chief Financial Officer, Ian McKechnie, submitted a financial analysis of the proposed merger to FHLB-Seattle's Vice President, Donald Mochel. In the letter, Mr. McKechnie based the financial analysis of the merger on usage of purchase accounting and amortization of the acquired goodwill over a period of forty years. Letter from Ian McKechnie, Chief Financial Officer of Franklin, to Donald Mochel, Vice President of FHLB-Seattle (April 22, 1983) ("[Franklin] has recorded as goodwill on its balance sheet, at September 30, 1982, $342 million representing the difference between the fair value of the liabilities assumed and the assets acquired. It has accorded a life of 40 years to this asset and is amortizing this goodwill on a straight-line basis, ratably over 480 months.").

In 1985, the FHLBB encouraged Franklin to acquire Western Heritage Savings and Loan Association ("Western"), another failing thrift institution. See Damages Decision I, 52 Fed. Cl. at 225. To assist Franklin in its acquisition of Western, FSLIC provided $8.8 million of cash assistance to the resulting merged institution. Id. Franklin also contracted with the FHLBB to receive several forbearances, including: (1) the ability to amortize the goodwill acquired in the transaction over a period of twenty-five years; (2) the ability to exclude losses, liabilities, and scheduled items attributable to Western in computing minimal capital requirements for a period of five years; and (3)

the ability to book cash assistance from FSLIC as a credit to Franklin's net worth.  Id. at 225, 225 n.5.[5]

In 1986, Franklin decided to convert to a public corporation and sought approval from the FHLBB for doing so.  In connection with the approval of its conversion to a public corporation, Franklin agreed to reduce the remaining thirty-six years of its amortization period for the goodwill associated with the Franklin-Equitable transaction to twenty-eight years.  Robert E. Wolpert Aff. ¶ 5.

B.

Congress passed FIRREA in 1989.  Pub. L. No. 101-73, 103 Stat. 183 (1989). Amongst numerous other changes to the thrift industry, FIRREA required that all federally insured thrifts meet tangible capital, core capital, and risk-based capital requirements.  12 U.S.C. § 1464(t) (2000).  Under the newly enacted standards, supervisory goodwill could no longer be included in satisfying minimal tangible capital requirements, and its use for meeting core capital level requirements was to be phased out over the course of five years.  Damages Decision I, 52 Fed. Cl. at 225.

The newly enacted requirements with respect to the treatment of supervisory goodwill had an immediate deleterious impact on Franklin's financial position.  Id. Specifically, the change resulted in Franklin immediately becoming insolvent and facing a tangible capital account deficiency of nearly $178 million.  Id.  As a consequence of Franklin's insolvency, OTS required it to submit a capital plan outlining its program for

---

[5]      The Court of Federal Claims specifically held that Franklin had contracted with the FHLBB to receive certain forbearances in the Franklin-Western merger, which forbearances included the amortization of goodwill over a twenty-five-year period. Damages Decision I, 52 Fed. Cl. at 225, 225 n.4, 225 n.5.  The government does not challenge this determination on appeal.

achieving capital compliance.  Id.  Franklin submitted such a plan to OTS on January 8, 1990.  Id.  OTS formally rejected the plan on February 20, 1990, and it placed Franklin into an RTC conservatorship.  Id.  The FDIC later took over responsibility for managing Franklin in receivership.

III.

Following the placement of Franklin into receivership, Suess brought a derivative suit in the Court of Federal Claims on behalf of Franklin, seeking damages for the losses occasioned by the enactment of FIRREA.  The government, in due course, brought a motion to dismiss for lack of jurisdiction and lack of standing.  Denying the motion, the court concluded that it possessed jurisdiction over the derivative suit and that the shareholder plaintiffs were not required to show individual standing to bring the suit.  Suess v. United States, 33 Fed. Cl. 89, 97 (1995).  The court then, over the course of three subsequent decisions, determined the merits of Suess's dispute and its entitlement to damages.

In the Contract Decision, the Court of Federal Claims granted summary judgment in favor of Suess on the issue of liability.  In so doing, the court rejected the government's argument that there was no contract between Franklin and the government providing for the use of purchase accounting and for the amortization of goodwill over twenty-eight years in the case of the Franklin-Equitable merger and over twenty-five years in the case of the Franklin-Western merger.

Most relevant to the present appeal, the government argued that the various documents detailing the discussions between Franklin and the government in the Franklin-Equitable merger did not evidence an intent on the part of the government to

guarantee Franklin's continued use of purchase accounting or its ability to amortize goodwill. Contract Decision, 39 Fed. Cl. at 775–76. The government contended that the absence of an express contract guaranteeing Franklin's right to use purchase accounting or to amortize its goodwill foreclosed any obligation on the part of the government to compensate Franklin for losses resulting from the regulations' disallowing the application of those accounting methods. Id. The government further contended that an approval of a merger cannot constitute a contract guaranteeing the continued use of an accounting method used in the merger. Id. at 776. The court rejected these arguments, concluding that the documents generated during the FHLBB's approval of the Franklin-Equitable merger, when considered together, evidenced an intent on the part of the government to guarantee continued use of purchase accounting and amortization of goodwill. The court concluded:

> Suess Plaintiffs adequately demonstrate that the intent existed to form a contract concerning the amortization of goodwill. Suess Pl. Mot. Summ. J. at 8–12 (citing letters, the Merger Application, independent accountants' opinions, the FHLBB-Seattle's internal "merger digest," and deposition and affidavit testimony of government and [Franklin] negotiators).

Contract Decision at 776. Finally, as noted above, the Court of Federal Claims also rejected the government's argument that a similar contract for the treatment of goodwill did not arise out of the Franklin-Western merger. Id. at 767.

In addition, the government argued that, when it acquired Equitable, Franklin assumed the risk that the government might alter the regulations controlling the treatment of goodwill as regulatory capital. Id. at 768. The court also rejected that argument. The court determined that Franklin reasonably relied on the government's approval of the merger as a guarantee of the continued ability to amortize goodwill. Id.

at 769.  The court, moreover, was persuaded that Franklin, like the plaintiffs in Winstar II, would not have rationally pursued a merger with Equitable had it not assumed that it would be permitted to amortize the goodwill acquired from the transaction.  In the court's view, this strongly suggested that Franklin did not assume the risk of an alteration in regulatory policy.  Id. at 769–70.

The Court of Federal Claims did not, in the Contract Decision, enter any findings as to whether the government had breached its contracts with Franklin.  Rather, the court merely held that contracts between the government and Franklin regarding the use of the purchase method of accounting and treatment of goodwill had arisen in both the Franklin-Equitable and Franklin-Western transactions.  See generally id.  The court further ordered, at the conclusion of the Contract Decision, that the government show cause as to why liability should not be found on all such contracts between the government and the plaintiff thrifts that were parties in the case.  Id. at 779.  The government does not appear to have successfully argued against entry of liability, and the court, by an unpublished decision dated November 12, 1998, entered summary judgment in favor of Franklin, holding that the government was liable for breaching both contracts with Franklin.  See Damages Decision I, 52 Fed. Cl. at 224.

Following its holding in the Contract Decision that contracts existed between the government and Franklin with respect to the treatment of goodwill and the later entry of judgment in favor of Franklin on the issue of liability, the court turned to the question of the appropriate measure of damages.  Before that, on April 13, 1999, the court permitted the FDIC to join the suit as a party, although the FDIC did not participate extensively during the subsequent trial on damages.  Id. at 224 n.2.  The court permitted

the FDIC's joinder as a party in order to protect the interests of Franklin, after concluding that the joinder would not impose any unreasonable hardship upon the United States. Suess v. United States, No. 90-981C (Ct. Fed. Cl. Apr. 13, 1999).

Following a trial, in Damages Decision I, the Court of Federal Claims awarded Suess damages in the amount of $35 million. This sum represented the difference in the value of Franklin's stock prior to the government breach ($35 million) and after the breach ($0). 52 Fed. Cl. at 231 In arriving at this figure, the court rejected Suess's claims to expectation and restitution damages. Id. at 225–30.

In awarding damages based upon Franklin's stock's market value, the court did not attempt to distinguish between damages attributable to the breach of the contract associated with the Franklin-Equitable merger and those associated with the Franklin-Western merger. Instead, the court apparently conflated the two breaches, assuming that their combined effect was to render Franklin insolvent. In addition, the court did not enter findings as to whether the breach of the contract associated with the Franklin-Western transaction or that associated with the Franklin-Equitable transaction would have alone rendered Franklin insolvent.

Following Damages Decision I, both Franklin and the government filed Motions for Reconsideration. Franklin argued in its motion, inter alia, that it was entitled to a fifty-percent "control premium" over the market value of its stock prior to the breach and that it should receive a "gross up" for tax liabilities incurred while in receivership. The government argued in its motion that the court should set aside its award of damages.

The Court of Federal Claims, adhering to its theory that the market capitalization of Franklin comprised the appropriate measures of damages, concluded that a control

premium was required to properly reflect the true market capitalization of the company. Damages Decision II, 74 Fed. Cl. at 513. The court reasoned that a control premium awards a shareholder who controls the operations of a company and that, since Franklin controlled its own internal operations, it was entitled to a control premium. Id. Relying upon evidence submitted by the parties as to the appropriate amount of the control premium, the court awarded a premium comprising fifty percent of the market capitalization of Franklin. Id. Franklin's roughly $35 million market capitalization award, coupled with the fifty-percent control premium, resulted in a total damages award of $52,008,750. Id. at 518. In arriving at this figure, the court rejected the government's argument that any award to Suess should be reduced by the amount of Franklin's residual value in receivership. Id. at 516. Finally, the court rejected Suess's claim for compensation for certain taxes paid on behalf of Franklin by the FDIC while Franklin was in receivership. Id. at 515.

In Damages Decision II, the Court of Federal Claims again did not attempt to separate the damages attributable to the Franklin-Equitable breach from those attributable to the Franklin-Western breach. Rather, the court apparently assumed that the combined effect of these breaches drove Franklin into insolvency and therefore justified an award of damages based upon Franklin's market capitalization prior to the breach, with an added control premium.

## DISCUSSION

### I.

On appeal, the government challenges the decisions of the Court of Federal Claims on both liability and damages. As far as the court's liability decision is

concerned, the government does not appeal the court's conclusion that it breached the contract that arose from the Franklin-Western transaction. It does argue, however, that the court erred as a matter of law in holding that a contract existed between Franklin and the government for the treatment of goodwill arising out of the Franklin-Equitable transaction. As a result, the government states, it could not be held liable for breach of contract. As far as damages are concerned, the government argues that the court erred as a matter of law in awarding the 1989 stock market capitalization of Franklin as the thrift's damages for breach of contract and in awarding a fifty percent control premium in addition to Franklin's stock market capitalization. The government also argues that the court erred in failing to reduce the award of Franklin's market capitalization by Franklin's existing value in the receivership.

Suess responds that the Court of Federal Claims correctly held that the government entered into, and breached, a binding supervisory goodwill contract with Franklin relating to the Franklin-Equitable transaction. It also argues that the court did not err, and properly exercised its discretion, in arriving at its damages award. The FDIC's sole argument on appeal relates to damages. It urges us to reject the government's argument that the damages award should be reduced by the positive amount in the receivership, contending that the government's position on this point is contrary to controlling Winstar precedent. In addition, Suess cross-appeals the determination of the Court of Federal Claims in Damages Decision II not to award it compensation for the payment of certain taxes by the FDIC on behalf of Franklin.

For the reasons set forth below, we agree with the government that no contract existed between Franklin and the government for the treatment of goodwill arising from

the Franklin-Equitable transaction. The Court of Federal Claims therefore erred in holding the government liable for breach of contract and in awarding damages in connection with that transaction. Because we dispose of the appeal on the basis of liability, we do not address the issue of damages.

II.

As seen above, the Court of Federal Claims decided liability on summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." R. Ct. Fed. Cl. 56(c). We review a grant of summary judgment by the Court of Federal Claims de novo. Amerisource Corp. v. United States, 525 F.3d 1149, 1152 (Fed. Cir. 2008). Generally, whether a contract exists is a mixed question of law and fact. Caroline Hunt Trust Estate v. United States, 470 F.3d 1044, 1049 (Fed. Cir. 2006). In this case, however, the pertinent facts are not in dispute. The question of whether a contract existed between the government and Franklin regarding the treatment of goodwill thus reduces to a question of law—whether as a matter of law, on the given facts, a contract existed between the government and Franklin. We review the Court of Federal Claims' legal conclusions de novo. USA Choice Internet Servs., LLC v. United States, 522 F.3d 1332, 1336 (Fed. Cir. 2008).

The requirements for a contract between the United States and a private party are (1) mutuality of intent to contract, (2) consideration, (3) lack of ambiguity in offer and acceptance, and (4) authority on the part of the government agent entering the contract. D&N Bank, 331 F.3d at 1378; Lewis v. United States, 70 F.3d 597, 600 (Fed. Cir. 1995).

A contract need not be memorialized in a single document; rather, "a contract may arise as a result of the confluence of multiple documents" so long as there is "a clear indication of intent to contract[,] and the other requirements for concluding that a contract was formed" are met. D&N Bank, 331 F.3d at 1378; Cal. Fed., 245 F.3d at 1347.

On appeal, the government focuses solely upon the requirement of intent to contract, contending that the documents involved in the FHLBB's approval of the merger do not evince intent on the government's part to guarantee the continued ability of Franklin to utilize purchase accounting or to amortize goodwill. Accordingly, we limit our discussion to that prong of the test for the existence of a contract and do not reach the issues of the existence of consideration, unambiguous offer and acceptance, or authority on the part of the contracting government agent.

Though an implied-in-fact contract guaranteeing continued use of purchase accounting and goodwill amortization can arise from parties' statements and documents surrounding a merger, "there needs to be something more than a cloud of evidence that could be consistent with a contract to prove a contract and enforceable contract rights." D&N Bank, 331 F.3d at 1377. Specifically, in order to prove that the government intended to guarantee continued use of purchase accounting or a specific amortization period, the party alleging the existence of such a contract must allege "something more" than the mere approval of the merger by the FHLBB. Id. at 1378. As we stated in D&N Bank: "Mere approval of the merger does not amount to an intent to contract. The [FHLBB], in its regulatory capacity, must approve all mergers. . . . An agency's performance of its regulatory or sovereign functions does not create contractual

obligations." Id. Rather, "there must be an objective manifestation of voluntary, mutual assent. . . . To satisfy its burden to prove such a mutuality of intent, a plaintiff must show, by objective evidence, the existence of an offer and a reciprocal acceptance." Anderson, 344 F.3d at 1353.

The determination of whether the government has shown assent to a contract guaranteeing a particular treatment of goodwill is a fact-intensive inquiry. In D&N Bank, Anderson, and First Federal Lincoln Bank v. United States, 518 F.3d 1308 (Fed. Cir. 2008), we found the evidence presented insufficient to support the existence of intent to contract on the government's part. By contrast, in Winstar I, Fifth Third Bank of W. Ohio v. United States, 402 F.3d 1221 (Fed. Cir. 2005), California Federal, LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363 (Fed. Cir. 2003), and La Van v. United States, 382 F.3d 1340 (Fed. Cir. 2004), we considered the evidence presented sufficient to demonstrate intent to contract on the government's part. We think that the undisputed facts before us put this case in the D&N Bank, Anderson, and First Federal Lincoln line of authority. We therefore hold, as a matter of law, that Suess failed to establish the existence of a contract between the government and Franklin pursuant to which the government guaranteed the continued use of purchase accounting or the amortization of goodwill by Franklin.

III.

In D&N Bank, D&N Bank ("D&N") relied on a number of documents exchanged between the FHLBB and D&N during the approval of its acquisition of another thrift as establishing an intent to contract on the government's part. 331 F.3d at 1377. These documents included a merger agreement contingent upon the government's approval of

the purchase method of accounting, various internal government memoranda, an FHLBB resolution conditioning approval of the merger on the submission of detailed accounting analyses of the supervisory goodwill that would arise from the use of purchase accounting, and an accountant's letter submitted by D&N in satisfaction of the requirement for detailed accounting analyses of the supervisory goodwill. Id. at 1378. None of the documents purported to be a contract binding upon D&N and the FHLBB. Id. After reviewing this evidence, we concluded that the only document that could arguably demonstrate intent to contract on the government's part was the FHLBB resolution conditionally approving the merger. Id. We determined, however, that the resolution did not evince the requisite intent to contract because it merely approved the merger and use of the purchase method of accounting; it did not contain any promise by the government with respect to amortization of goodwill or to guaranteeing the continued use of the purchase method of accounting. Id. at 1378–79. We stated:

> Mere approval of the merger does not amount to intent to contract. The [FHLBB], in its regulatory capacity, must approve all mergers. . . . An agency's performance of its regulatory or sovereign functions does not create contractual obligations. . . . Something more is necessary. The [FHLBB] Resolution says nothing about goodwill and there was no negotiation between D&N Bank and the [FHLBB] that resulted in approval of the merger. D&N and First Federal simply submitted an application for approval of the merger, and the [FHLBB] accepted it.

Id.

We also did not find any intent to contract on the government's part under a similar fact pattern in Anderson. In Anderson, The Westport Company ("Westport") proposed to acquire Dade County Savings and Loan Association ("Dade"). 344 F.3d at 1347. Westport submitted an application to the FHLBB, specifically requesting use of the purchase method of accounting and amortization of the goodwill acquired in the

transaction over a period of forty years. Id. The FHLBB ultimately determined to approve the merger of Westport and Dade but did not mention the amortization of goodwill in its approval letter. Id. We noted that, to the extent that the government entered into any contract with Westport, its approval letter, which lacked any term relating to the treatment of goodwill, effectively constituted a counter-offer, repudiating Westport's initial offer that it merge with Dade and amortize goodwill arising from the transaction. Id. at 1358. Westport, we determined, effectively accepted that counter-offer by proceeding with the merger in the face of the government's failure to guarantee Westport's ability to amortize goodwill. Id. Thus, any contract between Westport and the government did not contain a term permitting Westport to amortize goodwill. See id.

We also concluded in Anderson that the government's course of conduct preceding the merger did not evidence an intent to form a contract with Westport. We considered two pieces of evidence as potentially containing the requisite assent to contract on the government's part: a Resolution providing conditions for the government's approval of the merger and a Forbearance Letter. Id. at 1355. The Resolution required Westport to submit accounting analyses of the merger addressing the reasonableness of Westport's treatment of goodwill. Id. We concluded that the Resolution merely imposed a condition on regulatory approval of the merger— submission of accounting analyses—and did not constitute any contractual guarantee of Westport's ability to utilize any specific method of goodwill amortization. Id. at 1355– 56. Similarly, the Forbearance Letter granted two forbearances, neither of which concerned Westport's ability to amortize goodwill. Id. at 1357. Accordingly, we concluded that the government merely approved the Westport-Dade merger and that it

did not assent to Westport's ability to amortize goodwill in a manner sufficient to support the existence of a contract to that effect. Id. at 1359.

In First Federal Lincoln, the government disputed the existence of a contract with respect to two of three mergers it had approved between First Federal Lincoln Bank ("Lincoln") and various failing thrift institutions. 518 F.3d at 1312–13. In the first of the two disputed mergers, between Lincoln and Tri-Federal Savings and Loan Association of Wahoo, Nebraska ("Tri-Federal"), Lincoln filed an application for merger seeking use of the purchase method of accounting. Id. at 1312. The FHLBB ultimately issued an approval letter in which it noted the use of the purchase method of accounting but did not address the amortization period for goodwill. Id. at 1313. In the second of the two disputed mergers, between Lincoln and First Federal Savings and Loan Association of Norfolk, Nebraska ("Norfolk"), Lincoln again filed an application for merger seeking use of the purchase method. Id. Again, the FHLBB issued an approval letter sanctioning the use of the purchase method of accounting. Id.

> After reciting the rule for contract formation, we concluded:

> There is no evidence that the government took any action to encourage [Lincoln] to merge with either Norfolk or Tri-Federal. There is also nothing in the merger agreements between [Lincoln] and Norfolk and Tri[-]Federal, or the government's approval letters that could evidence the government's intent to enter into a goodwill contract. In both mergers [Lincoln] communicated to the government a request only for, and in both mergers received, standard treatment of goodwill, including use of the purchase method of accounting and amortization of goodwill over a twenty-five year period in compliance with GAAP. Neither merger was designated as instituted for supervisory purposes, no government assistance was provided, there were no forbearances with respect to goodwill, and there was no negotiation with respect to the treatment of goodwill.

Id. at 1320–21.

IV.

We conclude that the evidence presented by the parties establishes that the FHLBB merely approved Franklin's use of purchase accounting and amortization of goodwill and did not contractually guarantee Franklin's continued ability to utilize the purchase method of accounting or to amortize goodwill. In our view, the relevant documents, as in D&N Bank, Anderson, and First Federal Lincoln, demonstrate only FHLBB approval of the Franklin-Equitable merger and do not support the existence of an intent to contract on the government's part. Indeed, all documents relied upon by Suess to demonstrate governmental intent to contract merely acknowledge the government's approval of purchase accounting or amortization of goodwill; they do not contain any agreement concerning Franklin's continued ability to employ those accounting methods. Though certain statements by former FHLB-Seattle officials made in affidavits during the litigation of this case do suggest the existence of intent to contract on the government's part with respect to the purchase method of accounting and the amortization of goodwill, we think that the lack of any statement suggesting an intent to guarantee continued use of purchase accounting and amortization of goodwill in the documents approving the merger is more probative of the question of governmental intent than are statements of government officials made years after the transaction at issue.

The May 12, 1982 letter from Mr. Downie to Mr. Faulstich proposing the Franklin-Equitable merger merely proposes that Franklin be permitted to use the purchase method. The letter states: "The acquisition will provide the resulting firm with a break-even in fiscal 1983 and profitability in 1984—assuming a continuation of the present

interest rate levels—through a combination of . . . factors [including the use of] purchase accounting." Letter from Robert Downie, President of Franklin, to James Faulstich, President of FHLB-Seattle (May 12, 1982). In First Federal Lincoln, we concluded that a similar request for use of purchase accounting on the part of a thrift did not provide a premise for intent to contract on the part of the government. 518 F.3d at 1320–21. Rather, we concluded that such a request merely demonstrated that the thrift solicited the ability to employ the purchase method and that the government approved its doing so, which alone was insufficient to prove any intent to contract on the government's part. Id. ("In both mergers [Lincoln] communicated to the government a request only for, and in both mergers received, standard treatment of goodwill, including use of the purchase method of accounting and amortization of goodwill over a twenty-five year period in compliance with GAAP. . . . [T]here was no negotiation with respect to the treatment of goodwill.").

The June 28, 1982 merger application submitted by Franklin to FHLB-Seattle contemplated the purchase method of accounting and recited the assumption that the goodwill acquired in the transaction would be amortized over the course of thirty-five years. In D&N Bank, we also confronted a merger agreement contingent upon the government's approval of the purchase method of accounting; we held that the government's approval of the merger agreement reflected only its sanctioning of the use of the purchase method at the time of the merger, not a contractual guarantee that D&N would be permitted to use the purchase method indefinitely. 331 F.3d at 1382. Similarly, in First Federal Lincoln, we held that approval of the amortization of goodwill does not constitute a guarantee that a thrift will be permitted to amortize goodwill over

the original period contemplated by the parties. 518 F.3d at 1320–21. Franklin's merger application did not provide a premise for the requisite governmental intent to contract, constituting merely an approval of the use of purchase accounting and goodwill amortization.

In the merger digest, FHLB-Seattle approved the Franklin-Equitable merger and granted three regulatory forbearances, none of which related to use of the purchase method of accounting or amortization of goodwill. The merger digest noted that "Equitable had independently negotiated an in-state, unassisted merger with [Franklin]," Digest: Application for Merger 1–2, and stated that "the proposed merger constitutes a voluntary, non-FSLIC assisted intra-state merger," id. at 2. The digest then stated that "[t]he transaction is to be accounted for by the purchase method." Id. at 3. Like the FHLBB resolution in D&N Bank, the merger digest merely describes an "independently negotiated" merger, recites FHLBB approval of the merger itself, and acknowledges use of the purchase method to account for the merger. See 331 F.3d at 1379. The merger digest does not contain any language that could be construed as a guarantee by the government that Franklin may use the purchase method indefinitely or that it may amortize goodwill for any specified period of time. Neither is there any reference to negotiations between Franklin and the FHLBB relating to the use of the purchase method of accounting or the amortization of goodwill.

Similarly, the September 8, 1982 letter from Mr. Faulstich to Mr. Downie conditionally approving the merger required Franklin to complete various tasks prior to the merger, including furnishing financial analyses of the thrift's treatment of goodwill. In addition, it approved three forbearances, none of which related to the purchase

method or treatment of goodwill. Thus, like the merger digest, the Faulstich letter recites FHLB-Seattle's approval of the merger but does not contain any promise relating to purchase accounting or goodwill; it therefore does not establish governmental intent to contract.

Finally, the April 22, 1983 letter from Mr. McKechnie to Mr. Mochel merely served to inform FHLB-Seattle that Franklin intended to use the purchase method and that it planned to amortize the goodwill acquired in the transaction over a forty-year period. The letter stated: "This combination was accounted for under the purchase method." Letter from Ian McKechnie, Chief Financial Officer of Franklin, to Donald Mochel, Vice President of FHLB-Seattle (Apr. 22, 1983). The letter did not contain any statement suggesting that the FHLBB had guaranteed Franklin's continued ability to utilize the purchase method. Similarly, the letter recited Franklin's intent to amortize the goodwill associated with the Franklin-Equitable merger over a period of forty years, but it did not contain any language suggesting that Franklin negotiated with the FHLBB the ability to amortize goodwill or that the FHLBB guaranteed Franklin's ability to amortize over a forty-year period. Rather, like the merger digest and the Faulstich letter, the McKechnie letter simply indicates that the FHLBB approved Franklin's proposed use of purchase accounting and amortization of goodwill. As we concluded in First Federal Lincoln, mere FHLBB approval of an accounting method or goodwill amortization is not sufficient to demonstrate intent to contract on the part of the government. 518 F.3d at 1320–21.

In sum, the documentary evidence does not demonstrate intent on the part of the FHLBB to enter into a contract with Franklin guaranteeing its continued use of the purchase method of accounting or amortization of goodwill. Suess, however, attempts

to support the existence of such a contract by pointing to depositions and affidavits of its and the government's witnesses. It cites to a deposition of Mr. Faulstich in which he stated that the FHLBB "was encouraging the merger between the two institutions." Faulstich Dep. 30. However, mere "encourag[ement]" of a merger does not amount to a governmental promise to guarantee continued use of purchase accounting or goodwill amortization, nor does it constitute negotiation between the government and the thrift regarding the terms of the merger. Suess also cites to an affidavit submitted by Mr. Downie in which he asserts that "[t]here were difficult negotiations with FHLB-Seattle and with FHLB's accountant Lynnwood Campbell in Washington, D.C. over whether the 40-year period was economically justified in our case. When the government was finally satisfied with the 40-year period, the final agreement was reached soon thereafter." Downie Aff. ¶ 5. A self-serving reference to "negotiations" by the former President of Franklin, however, does not suffice to prove intent to contract on the part of the government, particularly given the large number of contemporaneous documents that make no mention of a contract between Franklin and the FHLBB relating to purchase accounting or the amortization of goodwill or negotiations relating to such a contract. See Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1039 (Fed. Cir. 2003) (en banc) (declining to rely upon "extrinsic evidence" to alter the meaning of a merger contract deemed "unambiguous").

Suess also points to comments made by a former government official in connection with Franklin's 1986 conversion into a public corporation as reflecting a belief on the part of the FHLBB that a contract relating to purchase accounting and the amortization of goodwill arose out of the Franklin-Equitable merger. Prior to the

conversion, the Securities & Exchange Commission had adopted a new policy that set a maximum goodwill amortization period of twenty-five years. In approving Franklin's conversion to a public corporation, the FHLBB sought to enforce the policy. Eventually, following negotiations, Franklin and the FHLBB reached a compromise under which Franklin would reduce its goodwill amortization period to twenty-eight years in exchange for FHLBB approval of the conversion. Robert Wolpert, former Deputy Chief Accountant of the FHLBB's Office of Regulatory Policy Oversight, stated in his December 1996 affidavit that he did not believe the FHLBB could "unilaterally impose on [Franklin] a shorter amortization period than was agreed to in 1982," Wolpert Aff. ¶ 5, suggesting that Mr. Wolpert believed that the FHLBB was contractually bound to honor the amortization period originally allowed. Mr. Wolpert also stated in his affidavit: "Franklin was a mutual association which had merged with a failing thrift, [Equitable,] in 1982. As part of the consideration for the merger, [the FHLBB] had agreed to treat the resulting goodwill for regulatory purposes as a capital asset to be amortized over a 40 year period." Id. at ¶ 3 (emphasis added). Thus, Mr. Wolpert apparently believed that, in connection with the Franklin-Equitable merger, Franklin and the FHLBB had entered into a contract with respect to purchase accounting and the treatment of goodwill. However, Mr. Wolpert's belief, expressed in 1996, as to the nature of FHLBB's approval of a merger that occurred in 1982 does not, in our view, demonstrate contractual intent on the part of the government at the time of the merger agreement. See Coast Fed. Bank, 323 F.3d at 1039.

Finally, Suess cites to the November 1996 affidavits of Messrs. Faulstich and Mochel, both former FHLB-Seattle officials involved in the Franklin-Equitable merger.

Mr. Faulstich stated in his affidavit that "[t]he 40 year amortization period of goodwill agreed to by the FHLB of Seattle was an important part of the consideration received by [Franklin] in return for merging with Equitable." Faulstich Aff. ¶ 5 (emphasis added). Mr. Mochel similarly stated that "[e]ssential consideration provided by FHLBB to [Franklin] was the approval condition that [Franklin] could treat goodwill derived from the merger in accordance with [GAAP] for regulatory purposes." Mochel Aff. ¶ 5 (emphasis added). Mr. Mochel further stated that he "understood that purchase accounting and the 40 year amortization period constituted a material part of the financial projections used to justify the merger proposal and the Principal Supervisory Agent's approval." Id. ¶ 7. Finally, he asserted: "It is my understanding and belief that, upon final acceptance and review, merger authorizations were irrevocable and that subsequent FHLBB policies would not retroactively change the committed acceptance of merger conditions for an institution that was in compliance." Id. ¶ 8. These affidavits reflect Mr. Faulstich's and Mr. Mochel's apparent belief in 1996 that, when they approved the Franklin-Equitable merger in 1982, they committed the government to guaranteeing Franklin's use of purchase accounting and amortization of goodwill. However, as previously discussed, the documents exchanged between the FHLBB and Franklin at the time of the merger are notably devoid of any language suggesting that the government intended to contractually bind itself in such a way. Thus, we do not consider the Faulstich and Mochel affidavits sufficient to overcome the notable lack of any evidence in the documents leading to the approval of the merger of any contractual guarantee of Franklin's ability to utilize any specific accounting method. See Coast Fed. Bank, 323 F.3d at 1039.

V.

Suess argues, however, that our precedents in <u>Winstar I</u>, <u>Fifth Third Bank</u>, <u>California Federal</u>, <u>LaSalle Talman</u>, and <u>La Van</u> support the argument that the documents and testimony presented before the Court of Federal Claims establish the existence of a contract. We conclude that those precedents do not support Franklin's argument.

All three consolidated cases involved in the <u>Winstar I</u> decision featured assistance agreements from FSLIC. 64 F.3d at 1536–58 ("[Plaintiffs] acquired insolvent, failing thrifts under this policy of encouraging thrift mergers. In each case, they received the government's approval and assistance."). Similarly, in <u>LaSalle Talman</u>, we noted that the thrift pursuing a merger partner received cash assistance from the FSLIC. 317 F.3d at 1367. In the Franklin transaction, by contrast, the FSLIC provided no such cash assistance. Rather, the FHLBB merely approved the merger as proposed by Franklin.

Of course, the existence of FSLIC cash assistance is not necessary to prove intent to contract on the part of the government. In <u>Fifth Third Bank</u>, the President of Citizens Federal Bank FSB ("Citizens"), a thrift seeking to merge with four failing thrifts, repeatedly requested cash assistance from the FHLBB. 402 F.3d at 1226. The FHLBB declined to award Citizens cash assistance but promised Citizens that it would be permitted to amortize goodwill over an extended period of time as an inducement to complete the proposed mergers. <u>Id.</u> at 1226–27. Citizens consummated all four proposed mergers under this understanding. <u>Id.</u> Finding that a contract between the government and Citizens existed, we stated:

> [T]he parties <u>negotiated</u> the terms of the agreement—[Citizen's President] asked for cash assistance, and [the chief supervisory agent of FHLB-Cincinnati] <u>offered instead</u> that Citizens could book supervisory goodwill as an asset, which would count toward regulatory capital requirements, and Citizens could amortize the goodwill over an extended period of time. . . .

<u>Id.</u> at 1231 (emphases added). We have concluded that the evidence before us indicates that the interaction between Franklin and FHLB-Seattle featured no such negotiation for favorable accounting treatment as an inducement to Franklin to consummate the Franklin-Equitable merger. Franklin sought out Equitable as a merger partner, and the FHLBB approved the transaction as a regulatory matter, sanctioning the use of purchase accounting and goodwill amortization as proposed by Franklin.

Similarly, in <u>California Federal</u>, California Federal Bank ("California Federal") negotiated with the FHLBB the terms of its merger with two failing thrifts, specifically agreeing to assume the liabilities of the thrifts in exchange for the ability to amortize the acquired goodwill over an extended period of time. 245 F.3d at 1345, 1347. The FHLBB agreed to allow such amortization of goodwill and specifically granted regulatory forbearances addressing the treatment of goodwill. <u>Id.</u> at 1345. We found that California Federal had entered a contract with the government:

> Here, as in [Winstar II], the government bargained with [California Federal] to assume the net liabilities of the acquired thrifts in exchange for favorable regulatory consideration allowing goodwill to be counted as an asset for regulatory capital purposes and to be amortized over 35 to 40 years. We agree with the Court of Federal Claims that "[i]f the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda, and [FHLBB] resolutions confirm that intent, the absence of an [assistance agreement] or [supervisory agency action] should be irrelevant to the finding that a contract existed."

Id. at 1347 (quoting Contract Decision, 39 Fed. Cl. at 773). Here, by contrast, the two documents addressing the regulatory forbearances, the merger digest and the Faulstich letter of September 8, 1982, do not recite any regulatory forbearance related to the treatment of goodwill or the use of purchase accounting. In addition, we have concluded that the evidence does not indicate that Franklin negotiated with the FHLBB the right to use the accounting methods it did: it merely submitted a merger application proposing the use of purchase accounting and the amortization of goodwill, which application FHLB-Seattle approved.

Finally, in La Van, the FHLBB negotiated with certain officers and directors of Century Savings & Loan Association ("CSLA") the terms of CSLA's conversion from a state mutual association to a federally chartered stock corporation. 382 F.3d at 1342, 1347. The FHLBB approved the conversion and issued a resolution stating that CSLA "may amortize the value of any intangible asset resulting from the purchase over a period not to exceed 35 years by the straight line method." Id. at 1344. In finding that the government contracted with CSLA to permit CSLA to amortize goodwill over the course of thirty-five years, we considered the negotiations between the government and CSLA over the terms of the merger to comprise the "something more" than mere regulatory approval needed to demonstrate the existence of a contract. Id. at 1347. Here, by contrast, though Suess points to certain after-the-fact statements suggesting that negotiation took place between the government and Franklin, all of the documents actually associated with the merger refer only to FHLBB approval of the transaction and do not refer to the FHLBB's exchanging promises with Franklin or otherwise negotiating the terms of the Franklin-Equitable merger. Thus, unlike in La Van, the

contemporaneous evidence indicates that the FHLBB did not negotiate with Franklin any guarantee with respect to the use of the purchase method of accounting or the amortization of goodwill, but rather merely approved a merger that featured those accounting methods.

In short, we conclude that the facts of this case are similar to those in D&N Bank, Anderson, and First Federal, whereas the facts are distinguishable from those in Winstar I, LaSalle Talman, Fifth Third Bank, California Federal, and La Van. The evidence essentially demonstrates FHLBB approval of the Franklin-Equitable transaction. The evidence does not, when considered as a whole, convince us that the Franklin-Equitable merger involved any grant of FSLIC financial assistance, any bargaining for favorable accounting treatment, or any negotiation over the terms of the merger between Franklin and FHLB-Seattle. Rather, the evidence reflects the submission of a merger plan to FHLB-Seattle, premised upon the use of the purchase method of accounting and amortization of goodwill, which FHLB-Seattle approved. As such, the evidence does not demonstrate the "something more" than mere regulatory approval, which we have considered necessary to prove the existence of a contract between the government and the thrift at issue. First Federal Lincoln, 518 F.3d at 1320; D&N Bank, 331 F.3d at 1379.

VI.

As previously noted, the Court of Federal Claims held in the Contract Decision not only that the FHLBB contracted with Franklin with respect to its ability to utilize purchase accounting and to amortize goodwill in the Franklin-Equitable transaction, 39 Fed. Cl. at 776, but also that the FHLBB did so in the Franklin-Western transaction, id.

2007-5070, -5071                                   35

at 779. The court also determined that both contracts were breached. As noted, the government does not challenge the court's determination that such a contract arose in the Franklin-Western transaction and that the contract was breached. Accordingly, we do not disturb that aspect of the court's decision in this case.

Since we have determined, however, that a contract did not arise between the government and Franklin in the Franklin-Equitable merger regarding purchase accounting and the amortization of goodwill, we vacate the Court of Federal Claim's award of damages. Since the court did not separate the damages attributable to the Franklin-Equitable merger and those attributable to the Franklin-Western merger, instead concluding that Franklin was entitled to the value of its market capitalization with an added fifty-percent control premium in compensation for both breaches, we must vacate the entire award of damages and remand to the court so that it may determine, in the first instance, what damages, if any, are properly attributable solely to the government's breach of contract related to the Franklin-Western transaction.

CONCLUSION

For the foregoing reasons, we reverse the decision of the Court of Federal Claims that a contract arose between the government and Franklin guaranteeing the continued use of the purchase method of accounting and the amortization of goodwill in the Franklin-Equitable merger. At the same time, we vacate the court's award of damages to Franklin, which conflated the damages attributable to the breach of the purported Franklin-Equitable transaction contract and those attributable to the breach of the Franklin-Western transaction contract. We remand the case to the Court of Federal Claims so that it may determine what damages, if any, are necessary to compensate

Franklin for its losses associated <u>solely</u> with the government's breach of contract associated with the Franklin-Western transaction.

<u>REVERSED-IN-PART</u>, <u>VACATED-IN-PART</u>, and <u>REMANDED</u>