# United States Court of Appeals for the Federal Circuit

2008-5050, -5056

1ST HOME LIQUIDATING TRUST,
ROGER P. KAVANAGH, JR., EVERETTE E. MILLS, III,
and WILLIAM E. STONE,

Plaintiffs-Cross Appellants,

and

JOSEPH M. BRYAN, JR., GEORGE E. CARR, JR., JOANN DAVIS,
GENE DEMATTEO, JR., MS. ALLAN C. HOLLAN, ESTATE OF JOAN S. HILSON
(c/o SONHIL ASSOCIATES, c/o JOHN S. PYNE), JAMES B. MILLIKAN,
THOMAS G. NISBET, JR., JULE C. SPACH, LOUIS C. STEPHENS, JR.,
MARY ADAMS STEPHENS, M. WILLARD TUCKER,
SIT INVESTMENT ASSOCIATES, INC., SUSAN T. MELVIN, E.S. MELVIN,
DEE SMITH, JEANINE M. SMITH, RODNEY E. AUSTIN, MURRAY C. GREASON, JR.,
LASAHANE INVESTMENTS, ALBERT S. LINEBERRY, SR.,
MRS. CLARENCE B. JONES, JAMES C. RATCLIFF, HENRY V. CUNNINGHAM, JR.,
SARAH B. CUNNINGHAM, MARVIN L. FERREL, JR., WILLIAM C. FITZGERALD, III,
CAROLYN N. FITZGERALD, ROBERT L. KITTERMAN, JAMES E. MIMS,
ERLINE K. MIZE, WILLIAM R. MIZE, SR., CHARLES P. ROBINSON,
WILLIAM E. STONE, LARRY J.A. THOMPSON,
BROWN TECHNOLOGY ASSOCIATED, L.P., LESTER R. BURNETTE,
JOHN W. DAVIS, III, DAVID R. PARKER, MANUEL V. FERNANDEZ,
ALMA J. FERNANDEZ, CHARLES T. HAGAN III, TRUSTEE, MICHAEL W. HALEY,
H. CURTE HEGE, SR., JAMES E. HOLMES, JR.,
INVESTORS MANAGEMENT CORPORATION, NATIONAL INVESTORS,
DAN R. THOMASON, JR., ELIZABETH L. WINN, JAMES J. WINN, JR.,
YOUNG PHILLIPS EMPLOYEE PROFIT SHARING PLAN, F. JAMES BECHER, JR.,
CAROLINA HOSIERY MILLS, INC. EMPLOYEES PROFIT SHARING TRUST,
AVERY CHOPE, ALAN D. COHN, HYATT HAMMOND, BONNIE B. HAMMOND,
RICHARD T. HOWARD, ROBERT G. KELLEY, ANDREW D. KLINGENSTEIN
(TRUSTEE), JOHN KLINGENSTEIN, STANLEY W. MORTEN (TRUSTEE),
FREDERICK A. KLINGENSTEIN, PATRICIA D. KLINGENSTEIN,
SARAH D. KLINGENSTEIN (TRUSTEE), SHARON L. KLINGENSTEIN,
THOMAS D. KLINGENSTEIN, MAURICE J. KOURY, ROBERT C. LOCK,
ROY MANESS, MCMILLION/EUBANKS, INC., MCMILLION/EUBANKS, INC.
EMPLOYEE PROFIT-SHARING PLAN, MADELINE J. MILLS
(CUSTODIAN FOR CLARENCE BLAKE AND WILLIAM EVERETTE MILLS),
WILLIAM G. MOORE, OKABENA PARTNERSHIP V-4, CHESTER T. NUTTALL, JR.,
WILLIAM G. PANNILL, WILLIAM L. PANNILL, QUEEN REALTY COMPANY,
OVIDE E. DE ST. AUBIN (TRUSTEE), H. MICHAEL WEAVER,
RTP LIMITED PARTNERSHIP, PAULINE S. HOVIS,

PATRICIA AUSTIN NUSSBAUM SEVIER (TRUSTEE),
ESTATE OF SARAH HUTCHENS BRINSON,
ESTATE OF ANITA P. BURGE BURTON, PRIME BANK,
KENDALL DEMATTEO BERKEY, ROBIN DEMATTEO,
ELIZABETH DEMATTEO FALCONE, CYNTHIA ANN FALCONE, KEVIN DEMATTEO,
ESTATE OF KATHERINE PREYER DEMATTEO (CO-ADMINISTRATORS),
RITA A. GALLOS, ESTATES OF JOHN H. and ANTOINETTE B. THOMAS
(J. CHRISTOPHER THOMAS, EXECUTOR), ALICE W. THOMASON,
J.S. BRODY REMAINDERMEN, LLC, ESTATE OF D.D. CAMERON (WILLIAM H.
CAMERON, EXECUTOR), MARSHA SHIFF, MARILYN LANE, HYNDA DALTON,
ELIZABETH G. KAVANAUGH, MARY CANNON MORRIS CHARITABLE
FOUNDATION, ESTATE OF EARL F. SLICK, LOUISE C. PALMER,
ANN L. BRENNER TRUSTEE (Q TIP TRUST), DAVID A. IRVIN, JOHN L.W. GARROU,
SANDRA K. GALLANT, SUCESSOR TRUSTEE, JOHN T. EAGAN, JR.,
RALPH H. WOMBLE, MARTHA H. WOMBLE, JOAN W. STONE,
CALDER W. WOMBLE, EDITH WOMBLE, GWYN WOMBLE DUNN,
JANE WOMBLE HAVER, WILLIAM F. WOMBLE, WILLIAM F. WOMBLE, JR.,
LOUISE M. WOMBLE, ANN W. STRADER, JCP ASSOCIATES PARTNERSHIP,
JOSE SORIANO, DIANE S. BRUMBACK, GEORGE R. BRUMBACK, TG PARTNERS,
AMY J. POLLINGER, LUCY L. KLINGENSTEIN, KATHY K. KLINGENSTEIN,
NANCY K. SIMPKINS, SUSAN KLINGENSTEIN,
and RAYMOND A. TIERNAN, TRUSTEE,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

Jerry Stouck, Greenberg Traurig, LLP, of Washington, DC, argued for plaintiffs-cross appellants and plaintiffs-appellees.

Kenneth M. Dintzer, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Michael F. Hertz, Deputy Assistant Attorney General, Jeanne E. Davidson, Director, David A. Levitt and John J. Todor, Trial Attorneys. Of counsel was Brian A. Mizoguchi, Trial Attorney.

Appealed from: United States Court of Federal Claims

Senior Judge Loren A. Smith

# United States Court of Appeals for the Federal Circuit

2008-5050, -5056

1ST HOME LIQUIDATING TRUST,
ROGER P. KAVANAGH, JR., EVERETTE E. MILLS, III,
and WILLIAM E. STONE,

Plaintiffs-Cross Appellants,

and

JOSEPH M. BRYAN, JR., GEORGE E. CARR, JR., JOANN DAVIS,
GENE DEMATTEO, JR., MS. ALLAN C. HOLLAN, ESTATE OF JOAN S. HILSON
(c/o SONHIL ASSOCIATES, c/o JOHN S. PYNE), JAMES B. MILLIKAN,
THOMAS G. NISBET, JR., JULE C. SPACH, LOUIS C. STEPHENS, JR.,
MARY ADAMS STEPHENS, M. WILLARD TUCKER,
SIT INVESTMENT ASSOCIATES, INC., SUSAN T. MELVIN, E.S. MELVIN,
DEE SMITH, JEANINE M. SMITH, RODNEY E. AUSTIN, MURRAY C. GREASON, JR.,
LASAHANE INVESTMENTS, ALBERT S. LINEBERRY, SR.,
MRS. CLARENCE B. JONES, JAMES C. RATCLIFF, HENRY V. CUNNINGHAM, JR.,
SARAH B. CUNNINGHAM, MARVIN L. FERREL, JR., WILLIAM C. FITZGERALD, III,
CAROLYN N. FITZGERALD, ROBERT L. KITTERMAN, JAMES E. MIMS,
ERLINE K. MIZE, WILLIAM R. MIZE, SR., CHARLES P. ROBINSON,
WILLIAM E. STONE, LARRY J.A. THOMPSON,
BROWN TECHNOLOGY ASSOCIATED, L.P., LESTER R. BURNETTE,
JOHN W. DAVIS, III, DAVID R. PARKER, MANUEL V. FERNANDEZ,
ALMA J. FERNANDEZ, CHARLES T. HAGAN III, TRUSTEE, MICHAEL W. HALEY,
H. CURTE HEGE, SR., JAMES E. HOLMES, JR.,
INVESTORS MANAGEMENT CORPORATION, NATIONAL INVESTORS,
DAN R. THOMASON, JR., ELIZABETH L. WINN, JAMES J. WINN, JR.,
YOUNG PHILLIPS EMPLOYEE PROFIT SHARING PLAN, F. JAMES BECHER, JR.,
CAROLINA HOSIERY MILLS, INC. EMPLOYEES PROFIT SHARING TRUST,
AVERY CHOPE, ALAN D. COHN, HYATT HAMMOND, BONNIE B. HAMMOND,
RICHARD T. HOWARD, ROBERT G. KELLEY, ANDREW D. KLINGENSTEIN
(TRUSTEE), JOHN KLINGENSTEIN, STANLEY W. MORTEN (TRUSTEE),
FREDERICK A. KLINGENSTEIN, PATRICIA D. KLINGENSTEIN,
SARAH D. KLINGENSTEIN (TRUSTEE), SHARON L. KLINGENSTEIN,
THOMAS D. KLINGENSTEIN, MAURICE J. KOURY, ROBERT C. LOCK,
ROY MANESS, MCMILLION/EUBANKS, INC., MCMILLION/EUBANKS, INC.
EMPLOYEE PROFIT-SHARING PLAN, MADELINE J. MILLS
(CUSTODIAN FOR CLARENCE BLAKE AND WILLIAM EVERETTE MILLS),
WILLIAM G. MOORE, OKABENA PARTNERSHIP V-4, CHESTER T. NUTTALL, JR.,

WILLIAM G. PANNILL, WILLIAM L. PANNILL, QUEEN REALTY COMPANY,
OVIDE E. DE ST. AUBIN (TRUSTEE), H. MICHAEL WEAVER,
RTP LIMITED PARTNERSHIP, PAULINE S. HOVIS,
PATRICIA AUSTIN NUSSBAUM SEVIER (TRUSTEE),
ESTATE OF SARAH HUTCHENS BRINSON,
ESTATE OF ANITA P. BURGE BURTON, PRIME BANK,
KENDALL DEMATTEO BERKEY, ROBIN DEMATTEO,
ELIZABETH DEMATTEO FALCONE, CYNTHIA ANN FALCONE, KEVIN DEMATTEO,
ESTATE OF KATHERINE PREYER DEMATTEO (CO-ADMINISTRATORS),
RITA A. GALLOS, ESTATES OF JOHN H. and ANTOINETTE B. THOMAS
(J. CHRISTOPHER THOMAS, EXECUTOR), ALICE W. THOMASON,
J.S. BRODY REMAINDERMEN, LLC, ESTATE OF D.D. CAMERON (WILLIAM H.
CAMERON, EXECUTOR), MARSHA SHIFF, MARILYN LANE, HYNDA DALTON,
ELIZABETH G. KAVANAUGH, MARY CANNON MORRIS CHARITABLE
FOUNDATION, ESTATE OF EARL F. SLICK, LOUISE C. PALMER,
ANN L. BRENNER TRUSTEE (Q TIP TRUST), DAVID A. IRVIN, JOHN L.W. GARROU,
SANDRA K. GALLANT, SUCCESSOR TRUSTEE, JOHN T. EAGAN, JR.,
RALPH H. WOMBLE, MARTHA H. WOMBLE, JOAN W. STONE,
CALDER W. WOMBLE, EDITH WOMBLE, GWYN WOMBLE DUNN,
JANE WOMBLE HAVER, WILLIAM F. WOMBLE, WILLIAM F. WOMBLE, JR.,
LOUISE M. WOMBLE, ANN W. STRADER, JCP ASSOCIATES PARTNERSHIP,
JOSE SORIANO, DIANE S. BRUMBACK, GEORGE R. BRUMBACK, TG PARTNERS,
AMY J. POLLINGER, LUCY L. KLINGENSTEIN, KATHY K. KLINGENSTEIN,
NANCY K. SIMPKINS, SUSAN KLINGENSTEIN,
and RAYMOND A. TIERNAN, TRUSTEE,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

Appeals from the United States Court of Federal Claims in 95-CV-250,
Senior Judge Loren A. Smith.

_____

DECIDED: September 22, 2009
_____

Before MAYER, GAJARSA, and DYK, Circuit Judges.

GAJARSA, Circuit Judge.

In this Winstar-related case, the United States ("Government") appeals from the final judgment of the United States Court of Federal Claims, which held that the Government's enactment of the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) breached the Government's contractual promise to allow favorable accounting treatment of supervisory goodwill. Because no contract existed between the Government and 1st Home, we reverse.

**BACKGROUND**

The detailed history of the events that led to the savings and loan crisis of the 1980s, and subsequently to the Winstar line of cases, has been recounted in numerous opinions. See, e.g., United States v. Winstar Corp., 518 U.S. 839, 843–48 (1996) ("Winstar II"); Suess v. United States, 535 F.3d 1348, 1351–53 (Fed. Cir. 2008); Castle v. United States, 301 F.3d 1328, 1332–33 (Fed. Cir. 2002); Winstar Corp. v. United States, 64 F.3d 1531, 1534–36, 1538–39 (Fed. Cir. 1995) (en banc) ("Winstar I"). There is no need for us to repeat that history; therefore, we discuss here only those background facts that are most relevant to the present case. When large numbers of thrifts (also called savings and loan associations) began to fail in the 1980s, the Federal Savings and Loan Insurance Corporation (FSLIC) lacked sufficient funds to liquidate all of them. Winstar II, 518 U.S. at 847. Thus, the Federal Home Loan Bank Board (FHLBB or "Bank Board"), which supervised the FSLIC, encouraged healthy thrifts to acquire ailing thrifts. Id. at 847–48. To encourage such supervisory acquisitions, the FHLBB in some cases offered contractual incentives to the healthy thrifts—the primary incentive being a promise that the acquisitions would be subject to a particular

accounting treatment, called purchase-method accounting.  Id. at 848–49.  In other cases, the FHLBB approved the use of purchase-method accounting without entering into a contract.  Under purchase-method accounting, the acquiring institution could designate the excess of the purchase price over the fair value of all identifiable assets acquired as goodwill, called "supervisory goodwill" in the context of these supervisory mergers.  Id.  The supervisory goodwill incentivized healthy thrifts to acquire or merge with ailing thrifts because the healthy thrifts could count supervisory goodwill toward the reserve capital requirements imposed by federal regulations, and could amortize the goodwill over a long period of time.  Id. at 850–52.  Thus, an acquiring thrift could create goodwill and recognize it as reserve capital, thus improving its capital footing.  This practice led to unintended and unfortunate consequences.

Trying to correct a myriad of issues, Congress adopted FIRREA in 1989, completely restructuring federal thrift regulation.  Id. at 856–57.  Of most relevance here, thrifts were required to maintain set minimum capital requirements, and, following a transition period, supervisory goodwill could no longer be counted as a capital asset for federal regulatory purposes.  Id. at 857.  As a result, many supervisory thrifts could no longer meet their capital requirements, and some, such as Winstar Corp., were seized by the Government and liquidated.  Id. at 857–58.  Winstar and others then sued the Government for breach of contract.  Sitting en banc, this court held that the Government's passage of FIRREA breached its contractual promise in that case to allow favorable accounting treatment of supervisory goodwill, Winstar I, 64 F.3d at 1551, and the Supreme Court affirmed, Winstar II, 518 U.S. at 860.

2008-5050, -5056                    4

1st Home Federal Savings and Loan Association was a mutual thrift owned by its depositors.  1st Home Liquidating Trust v. United States, 76 Fed. Cl. 731, 734 (2007) ("CFC Decision").  In 1985, years before the passage of FIRREA, 1st Home sought to convert from a mutual thrift to a stock-ownership thrift to avoid insolvency.  Id. Specifically, 1st Home sought a voluntary supervisory conversion.  Id. at 733 & n.1.  "'A voluntary supervisory conversion is where a single entity acquires all of the stock of a thrift in exchange for contributing enough capital to satisfy regulatory net worth requirements without first receiving account holder approval or offering shares on the market.'"  Id. at n.1 (quoting Southtrust of Ga., Inc. v. United States, 54 Fed. Cl. 741, 742 n.1 (2002)).  Such conversions serve much the same purpose as the supervisory mergers described above, but one or more investors—rather than a healthy thrift— provide the additional capital to the ailing thrift.[1]  Here, 1st Home sought private investors to buy all of the stock generated by the conversion, thus infusing enough capital into 1st Home to avoid insolvency.  CFC Decision, 76 Fed. Cl. at 735.  The conversion would generate supervisory goodwill valued as the excess of liabilities over assets at the time of conversion.  Id.

To convert to stock form, 1st Home was required to comply with the applicable rules and regulations of the FHLBB and the FSLIC.  Id. at 734–35.  Thus, 1st Home

---

[1]    Thus, we refer to the goodwill generated by 1st Home's voluntary supervisory conversion as supervisory goodwill.
> The term supervisory goodwill means goodwill resulting from the acquisition, merger, consolidation, purchase of assets, or other business combination (if such transaction occurred on or before April 12, 1989) of (1) A savings association where the fair market value of assets was less than the fair market value of liabilities at the acquisition date; or (2) A problem institution.

12 C.F.R. § 567.1 (footnote omitted).

submitted its "Application for Voluntary Supervisory Conversion" and accompanying business plan to the FHLBB on July 23, 1985. Id. In its conversion application, 1st Home sought a regulatory forbearance, wherein the FHLBB would promise not to enforce certain minimum net worth requirements for a period of five years. Id. at 735. The Business Plan proposed the use of purchase-method accounting, or push-down accounting in this context,[2] and stated that an estimated $47.6 million in goodwill would be created by the conversion—$36.9 of which would be amortized over thirty years. Id. at 735 & n.6.

The FHLBB responded, indicating that it would provide the requested regulatory forbearance, but only for a three-year period rather than the requested five-year period. Id. at 735. Although that response letter ("Forbearance Letter") did not mention goodwill, id. at 741, an FHLBB internal memorandum ("Issues Memorandum") stated that the "conversion will generate a cash infusion of approximately $30 million, and will also involve the recognition of at least $48 million in goodwill through the use of push-down accounting," J.A. at 100483. The Issues Memorandum also noted that 1st Home "intends to convert from RAP [i.e., Regulatory Accounting Principles] to GAAP [i.e., Generally Accepted Accounting Principles] in order to qualify for a voluntary supervisory conversion, and subsequently intends to continue reporting in accordance with GAAP."[3] Id. The Issues Memorandum listed the following as "pros" of approving the conversion:

---

[2] Push-down accounting is a form of purchase-method accounting. In the context of the mutual-to-stock conversion at issue here, push-down accounting provides the same basis and accounting advantages as would be provided by purchase-method accounting in the context of an acquisition. Thus, the two terms are used interchangeably by the parties and the trial court.

[3] The purchase method of accounting is allowed under GAAP.

(1) "The conversion provides a solution to a potential supervisory case at no cost to the FSLIC"; and (2) "The conversion proceeds will serve to increase the net worth of the institution to a level in excess of the net worth requirement and will render the association a viable entity." Id. at 100485. The Issues Memorandum did not discuss a period for amortizing the goodwill and did not mention a forbearance associated with that goodwill.

On December 26, 1985, the FHLBB adopted Resolution No. 85-1214 ("Resolution"), approving the proposed conversion "in accordance with the terms of the application." CFC Decision, 76 Fed. Cl. at 735, 740 (internal quotation marks omitted). The Resolution required that 1st Home submit an accountant's letter detailing the amount of goodwill to be realized from the conversion and the GAAP-compliant amortization period and method to be applied to that goodwill. J.A. at 100543.

1st Home converted from mutual form to stock form on October 31, 1986. After the passage of FIRREA, 1st Home could no longer use the accounting principles that had allowed it to count goodwill as regulatory capital. 1st Home's financial condition declined, and it voluntarily self-liquidated in 1992–93, transferring its post-liquidation assets from the previously existing thrift to a liquidating trust. 1st Home Liquidating Trust and the 1st Home investors sued the Government, alleging that the Government had breached its contractual promise to allow favorable accounting treatment of supervisory goodwill. Both parties filed motions for summary judgment.

The Court of Federal Claims granted summary judgment in favor of 1st Home and the investors, holding that the parties had entered into a contract consisting of the following terms regarding goodwill: (1) 1st Home and its investors promised to convert

and recapitalize 1st Home, and (2) the Government promised 1st Home that it could use purchase-method accounting to count the resulting goodwill toward its regulatory capital requirements and to amortize the goodwill over an extended period. Specifically, the trial court determined that 1st Home's application for conversion and attached business plan constituted an offer—the terms of which included a proposed five-year net worth regulatory forbearance and favorable accounting treatment of supervisory goodwill. CFC Decision, 76 Fed. Cl. at 738–39. The trial court determined that the FHLBB did not accept that offer, but instead made a counter-offer by proposing a three-year regulatory forbearance and adopting all other terms of the initial offer. Id. at 741. In concluding that the Government made a counter-offer, the trial court relied on the following: (1) the Forbearance Letter assuring no enforcement of net worth regulatory requirements for three years; (2) the Issues Memorandum reciting the importance of goodwill amortization to the conversion; and (3) the fact that "had the conversion occurred without the favorable accounting treatment [of goodwill], the bank would have become immediately insolvent, nullifying the entire purpose of the conversion." Id. The court then determined that 1st Home accepted the Government's counter-offer by its conduct, namely by carrying out the conversion as described in the application and business plan. Id. at 741–42. After determining that the Government had materially breached its contract with 1st Home and the investors, the trial court awarded restitution damages totaling approximately $26 million to those persons that originally invested in 1st Home's conversion and their legal successors in interest.

The Government appealed to this court from the trial court's final judgment, and 1st Home and certain named investors cross appealed. We have jurisdiction over those appeals under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

The Government argues that the Court of Federal Claims erred when it determined that the FHLBB contracted with 1st Home and the investors to allow 1st Home to count supervisory goodwill as regulatory capital and to amortize it over an extended period. Because we agree with the Government and hold that no contract existed between it and 1st Home, we need not reach the Government's alleged points of error regarding the materiality of the breach and the damages award or 1st Home's cross appeal regarding the proper recipients of restitution damages.

Whether a contract exists is a mixed question of law and fact. Caroline Hunt Trust Estate v. United States, 470 F.3d 1044, 1049 (Fed. Cir. 2006). Contract interpretation is a question of law, which we review without deference. Castle, 301 F.3d at 1337. Summary judgment is appropriate if, when viewing the evidence in the light most favorable to the non-movant, the record indicates there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." R. Ct. Fed. Cl. 56(c); see also Fed. R. Civ. P. 56(c) (same). We review the grant of summary judgment by the Court of Federal Claims de novo. Winstar I, 64 F.3d at 1539.

The Court of Federal Claims erred when it determined that the FHLBB entered into a contract with 1st Home and the investors regarding goodwill. Under our precedent, "there needs to be something more than a cloud of evidence that could be consistent with a contract to prove a contract and enforceable contract rights." D & N

Bank v. United States, 331 F.3d 1374, 1377 (Fed. Cir. 2003). "In other words, 'something more' than mere regulatory approval of the merger must be shown." First Fed. Lincoln Bank v. United States, 518 F.3d 1308, 1320 (Fed. Cir. 2008) (quoting D & N Bank, 331 F.3d at 1379). The party asserting the existence of a contract "must show (1) mutuality of intent to contract; (2) consideration; and (3) lack of ambiguity in offer and acceptance." D & N Bank, 331 F.3d at 1378.[4] Here, there is nothing more than a granular cloud of evidence indicating that 1st Home and the Government contracted regarding goodwill. Thus, we reverse the trial court's grant of summary judgment.

In our recently decided Suess case, 535 F.3d 1348, we considered facts similar to those presented here and concluded that no contract regarding goodwill was formed. In Suess, Benjamin Franklin Federal Savings and Loan Association ("Franklin"), a healthy thrift, sought to merge with Equitable Savings and Loan Association ("Equitable"), an ailing thrift. Id. at 1353. As in the present case, the proposed transaction required FHLBB approval. See id. Thus, Franklin submitted an application for the proposed merger and presented a business plan to the FHLBB. Id. at 1354. The business plan stated that Franklin's use of purchase-method accounting was necessary for the merged entity to become profitable. Id. at 1353–54. A subsequent revised merger plan provided for amortization of goodwill over forty years. Id. at 1354. Representatives from Franklin and Equitable then met with FHLBB accountants to discuss the details of the merger, including the use of purchase-method accounting and

---

[4] Some opinions suggest a fourth prong, namely, government authority to enter into a contract. See, e.g., Suess, 535 F.3d at 1359; Hometown Fin., Inc. v. United States, 409 F.3d 1360, 1364 (Fed. Cir. 2005).

the amortization of goodwill over a forty-year period.  Id.  The FHLBB approved the merger and granted three forbearances, one of which was a net worth forbearance.  Id.  The FHLBB granted no forbearance regarding goodwill.

Ultimately, we reversed the trial court's grant of summary judgment in favor of Suess and Franklin's other shareholders.  We explained that "all documents relied upon by Suess to demonstrate governmental intent to contract merely acknowledge the government's approval of purchase accounting or amortization of goodwill; they do not contain any agreement concerning Franklin's continued ability to employ those accounting methods."  Id. at 1362.  We further explained that our Suess holding is consistent with precedent:

> In First Federal Lincoln, we concluded that a similar request for use of purchase accounting on the part of a thrift did not provide a premise for intent to contract on the part of the government.  518 F.3d at 1320–21.  Rather, we concluded that such a request merely demonstrated that the thrift solicited the ability to employ the purchase method and that the government approved its doing so, which alone was insufficient to prove any intent to contract on the government's part.  Id.  ("In both mergers [Lincoln] communicated to the government a request only for, and in both mergers received, standard treatment of goodwill, including use of the purchase method of accounting and amortization of goodwill over a twenty-five year period in compliance with GAAP. . . .  [T]here was no negotiation with respect to the treatment of goodwill.").

Id. at 1362–63 (omission and alteration in original).

In the present case, as in Suess, "approval of the amortization of goodwill does not constitute a guarantee that a thrift will be permitted to amortize goodwill over the original period contemplated by the parties."  See id. at 1363.  The Government did nothing more than acknowledge and approve of 1st Home's proposed accounting method and the standard treatment of goodwill associated with that method.  Thus, as in Suess, because the Government lacked the requisite intent to contract regarding the

treatment of supervisory goodwill, no contract was formed. Even though the FHLBB knew that it would benefit from 1st Home's conversion because it would "provide[] a solution to a potential supervisory case at no cost to the FSLIC," J.A. at 100485, that fact does not affect our analysis. Even if the FHLBB had encouraged the conversion, such encouragement does not amount to a guarantee that the regulations allowing purchase-method accounting and long-term amortization of supervisory goodwill will not change during the proposed amortization period. See Suess, 535 F.3d at 1364 ("[M]ere 'encourag[ement]' of a merger does not amount to a governmental promise to guarantee continued use of purchase accounting or goodwill amortization, nor does it constitute negotiation between the government and the thrift regarding the terms of the merger." (second alteration in original)).

Likewise, the investors' belief that the Government had promised favorable accounting treatment of the supervisory goodwill generated by the conversion is insufficient to overcome the fact that the documents do not evidence the Government's intent to contract regarding goodwill. See id. at 1364 (explaining that statements by Franklin's President evidencing his belief that the Government and Franklin had negotiated regarding goodwill were not "suffic[ient] to prove intent to contract on the part of the government, particularly given the large number of contemporaneous documents that make no mention of a contract between Franklin and the FHLBB relating to purchase accounting or the amortization of goodwill or negotiations relating to such a contract"). Moreover, the fact that the transaction made financial sense only if the goodwill could be amortized over an extended period does not evidence a mutual intent to contract regarding the accounting treatment of goodwill. In determining that a

contract was created, the trial court noted that "had the conversion occurred without the favorable accounting treatment [of goodwill], the bank would have become immediately insolvent, nullifying the entire purpose of the conversion." CFC Decision, 76 Fed. Cl. at 741. However, as we explained in D & N Bank, 331 F.3d at 1380, we will not "ignore the lack of proof of elements required to show the existence of a contract. Even if [the thrift] would have been instantly insolvent and out of regulatory compliance were it not allowed to treat goodwill as regulatory capital, that fact tells us nothing about the government's intent." Here, it was clear that 1st Home would benefit from the accounting rules in place at the time of the proposed transaction, but the record does not support 1st Home's assertion that the Government promised that 1st Home could continue to account for supervisory goodwill in a particular way should the accounting rules change.

Neither is our analysis altered by the fact that the FHLBB conditioned its approval of the conversion on receiving an accountant's letter detailing the proposed amortization of goodwill. In Anderson v. United States, 344 F.3d 1343, 1355–56 (Fed. Cir. 2003), the same request was insufficient to manifest a mutual assent to contract regarding goodwill.

Finally, as we explained in Suess, in the cases where we have recognized the formation of a contract, the Government clearly incentivized the relevant transactions by providing cash assistance or by making express promises regarding the accounting treatment of supervisory goodwill. See 535 F.3d at 1365–67; see also Fifth Third Bank of W. Ohio v. United States, 402 F.3d 1221, 1226, 1232 (Fed. Cir. 2005) (identifying a contract when the acquiring thrift requested cash assistance and the FHLBB offered

favorable accounting treatment of supervisory goodwill in lieu of cash assistance); D & N Bank, 331 F.3d at 1380 (explaining that "the holding in each other case [i.e. cases in which we identified a contract] was based on a showing that the thrift involved and the Bank Board had explicitly agreed to be bound"). The lack of such incentives in this case supports the view that a contract was not formed. The FHLBB merely approved the proposed transaction and never expressed an intent to contract regarding a particular accounting treatment or amortization of goodwill; that is insufficient proof to demonstrate that the Government contracted with 1st Home regarding goodwill. See First Fed. Lincoln Bank, 518 F.3d at 1320.

Our holdings in First Commerce Corp. v. United States, 335 F.3d 1373 (Fed. Cir. 2003), and Anderson, 344 F.3d 1343, are not to the contrary. In First Commerce, the Government expressly granted a forbearance regarding goodwill. 335 F.3d at 1378. The Government granted no such express goodwill forbearance here. Although the Forbearance Letter expressly granted a net worth forbearance, it did not mention goodwill. In Anderson, we determined that the thrift's proposed treatment of goodwill, which was discussed in the application materials submitted to the FHLBB, constituted a term of the thrift's offer to contract. 344 F.3d at 1354. However, we concluded that the Government did not assent to that term, and thus, that no contract regarding goodwill was formed. See id. at 1358 ("[T]he Forbearance Letter in the instant case is devoid of similar contractual language [i.e., an express promise in the three transactions cited] related to the amortization of goodwill. We must therefore conclude that the government did not manifestly assent to the goodwill amortization term of [the thrift's] offer."). Here, as in Anderson, even if we were to determine that 1st Home intended to

condition its offer of conversion upon a particular accounting treatment of supervisory goodwill, we would conclude, as we did in <u>Anderson</u>, that the FHLBB did not manifestly assent to that term of the offer.

Thus, for the reasons detailed above, we hold that the Government did not contract with 1st Home and the investors regarding the accounting treatment of the goodwill generated by the conversion.

## CONCLUSION

Because the Government lacked the requisite intent to enter into a contract with 1st Home regarding the accounting treatment of goodwill to be generated by 1st Home's conversion, no contract was formed, and thus, there was no breach. Therefore, we reverse the trial court's grant of summary judgment in favor of 1st Home and remand for the Court of Federal Claims to enter judgment in favor of the Government.

<u>REVERSED</u> and <u>REMANDED</u>

## COSTS

No costs.